IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ANTHONY RONDEL BLAIR | Criminal Action No.<br><br>1:18-CR-260-LMM-CMS |

**Government's Sentencing Memorandum**

The United States of America, by Ryan K. Buchanan, United States Attorney, and Tyler A. Mann and Calvin A. Leipold, III, Assistant United States Attorneys, for the Northern District of Georgia submits the following Sentencing Memorandum addressing the advisory guidelines range applicable to the Defendant and an appropriate sentence based on the factors set out in Title 18, United States Code, Section 3553(a).

**I.  Introduction**

Defendant Anthony Rondel Blair was convicted following a trial on May 23, 2023.  The jury found him guilty of six counts in the second superseding indictment. Having conducted the trial and sentenced a number of related defendants, the Court is well aware of the Defendant's conduct and crimes. As explained below, the Defendant, a leader in this conspiracy who has never accepted responsibility, should receive a sentence of 300 months, five years of supervised release, and a $600 special assessment from this Court.[1]

---

[1] The United States is also seeking a forfeiture money judgement against the Defendant that is addressed in a separately filed motion.

1

## II. The Presentence Investigation Report

The United States Probation Office issued its final Pre-Sentence Investigation Report ("PSR") on September 20, 2023. The PSR calculates that the Defendant has a total offense level of 41 and a criminal history score of 0. (PSR ¶¶ 94, 98). Based on this calculation, the Defendant's advisory Guideline range is 324-405 months. (PSR, Part D). There are a few areas in the PSR that the Government finds notable in recommending a sentence for the Defendant.

First, while this is the Defendant's first felony conviction, he has a long history of arrests between 2000 and 2016. (PSR ¶¶ 103-111). While none of these arrests resulted in convictions, they are instructive in that a number of the arrests involve violence. This suggests a need for mental health treatment. (PSR ¶ 124). It also demonstrates a repeated pattern of an inability to comply with the law.

Next, the PSR contains the Defendant's claims regarding prior employment. (PSR ¶ 129). As discussed further below, there is no evidence to support that the Defendant operated a legitimate business. Finally, there is the scope and size of this conspiracy. (PSR ¶ 13). The PSR identifies a number of people who were charged by the Government, but as this Court knows, there were dozens and dozens of unwitting people who became involved in the Defendant's scheme. This is clearly demonstrated by the sheer volume of travelers the Defendant sent to Costa Rica. Tr. Exh. 47. To fund that travel, he spent at least $105,669.08, just with Expedia. Tr. Exh. 320.

### III. Objections and Clarifications to the PSR

The Government filed two objections to the initial PSR, one of which impacts the Guidelines. The Defendant filed several objections and points of clarification to the PSR that the Government will address in turn.

#### a. The Government's Objection to the Defendant's Role in the Offense

The Government objects to the PSR's assessment of Mr. Blair's role in the offense as a "manager or supervisor" pursuant to § 3B1.1(b). (PSR ¶ 82).[2] The evidence of Mr. Blair's activity is best characterized as that of an "organizer or leader," thus warranting a four-level upward adjustment under § 3B1.1(a).

A defendant is subject to a four-level upward departure if he "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). To determine whether the defendant was an organizer or leader, as opposed to a manager or supervisor, the sentencing court may consider

> (1) the exercise of decision making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exerted over others.

U.S.S.G. § 3B1.1 comment. n.4; *United States v. Juarez*, 851 Fed. App'x 963, 967 (11th Cir. 2021). While each of the above factors may contribute to the analysis, no single

---

[2] The Defendant also objects to receiving this enhancement, but does not state a basis for that objection. (Defendant's Objections, page 3 (Aug. 7, 2023)).

factor is necessary to qualify a defendant as an organizer or leader. *United States v. Martinez*, 584 F.3d 1022, 1026 (11th Cir. 2009) ("There is no requirement that all of the considerations have to be present in any one case."). More than one person in the criminal enterprise may satisfy the criteria of organizer or leader. U.S.S.G. § 3B1.1 comment. n.4.

*Juarez* is particularly instructive in light of the facts of this case. In *Juarez*, the defendants personally recruited drug couriers and paid commissions to recruiters who supplied additional couriers. *United States v. Juarez*, 851 Fed. App'x at 968. They then provided couriers with plane tickets, travel itineraries, and drugs; monitored their travel; and provided the couriers means of avoiding detection. *Id*. at 965, 968. Importantly, a third party owned the narcotics, funded the operation, and requested updates from the defendants. *Id*. at 968. Nevertheless, because "the degree of authority [the defendants] exercised over the couriers was essentially complete," the Eleventh Circuit found that the district court properly characterized them as organizers or leaders. *Id*. at 968.

Here, just as in *Juarez*, the Defendant recruited couriers, booked their travel, monitored their travel, and collected the drugs once the couriers landed in Atlanta. (PSR ¶¶ 15, 60-62). Additionally, the Defendant paid commissions to recruiters who located other couriers for him. *Juarez*, 851 Fed. App'x at 968; Tr. Exh. 47; Tr. Exh. 111, p. 7. The Defendant then transported drugs to Rhode Island and received payment for his work, and more than five people were involved in the

4

offense. Tr. Exh. 47. These facts support a four-level enhancement for the Defendant's leadership role.

### b. The Defendant's Objection to the Drug Quantity and Base Offense Level

Mr. Blair objects to the draft PSR's drug quantity of 190 kilograms of cocaine and base offense level of 36 based upon insufficiency of the evidence at trial. He also argues that he is entitled to the same base offense level that Defendant Arias received in his negotiated plea agreement. (Defendant's Objections, page 3 (Aug. 7, 2023); PSR ¶ 79). However, "[c]alculating the base offense level for drug distribution requires a determination of the quantity of illegal drugs properly attributable to the defendant," regardless of the amount actually seized. *United States v. Frazier*, 89 F.3d 1501, 1506 (11th Cir. 1996). "Where . . . the amount seized does not reflect the scale of the offense," the court should make a "fair, accurate, and conservative estimate[]" of the drug quantity attributable to the defendant. *U.S.S.G.* § 2D1.1, comment. (n. 5) (2021); *United States v. Rodriguez*, 398 F.3d 1291, 1296 (11th Cir. 2005). The drug quantity calculation must be supported by a preponderance of the evidence. *United States v. Agis-Meza*, 99 F.3d 1052, 1055 (11th Cir. 1996).

The court may consider typical prices for the controlled substance, similar drug transactions by the defendant, and financial or business records to calculate this estimate. *U.S.S.G.* § 2D1.1, comment. (n. 5) (2021); *see United States v. Frazier*, 89 F.3d 1501, 1506 (11th Cir. 1996) ("a court may base its computation on

evidence showing the average frequency and amount of a defendant's drug sales over a given period of time"). In *United States v. Fergile*, the Eleventh Circuit affirmed the district court's attribution of 18.4 kilograms of cocaine to the defendant at sentencing. *United States v. Fergile*, 2023 U.S. App. LEXIS 11589, *7 (11th Cir. May 11, 2023). A jury had convicted the defendant of conspiring to import between 500 grams and five kilograms of cocaine based upon the government's seizure of 2.4 kilograms. *Id*. However, in addition to the amount seized, the government presented evidence that the defendant had orchestrated at least seven additional drug exchanges involving nine packages of cocaine. *Id*. at *8. The district court based the amount attributable to the defendant upon the number of trips his couriers had made and number of packages they had transported. *Id*. While the weight of those packages was not known, the court relied upon testimony regarding the packages' size in comparison to the seized packages and the amount of money exchanged for two of the packages. *Id*. That the same person "was responsible for packing and providing the suitcases to his couriers" also indicated that each package would have had a similar weight. *Id*. at *10. *See also United States v. Curry*, 188 Fed. Appx. 863, 875–76 (11th Cir. 2006) (finding under preponderance of the evidence that crates shipped to defendant via same method as seized drug shipment contained drugs attributable to defendant, and using weights of crates to estimate amount).

Thus, based on 11th Circuit precedent, the PSR appropriately calculates the Defendant's drug weight. The calculations in the PSR are based on interviews with Arias and Newton and supported by travel records showing the Defendant

sent 94 people to Costa Rica, the Defendant's text messages regarding the couriers, financial documents, and drug seizures. (PSR ¶¶ 25-27, 41-42, 47-73).

Next, the Defendant argues that he is entitled to the same drug weight as co-defendant Arias. First, the Government's recommendation in Arias's plea agreement is not binding on the court. Further, that recommendation was entered into as part of a negotiated resolution of Arias's case on August 10, 2022. (Doc. 244). The information the Government obtained from Arias regarding his conduct could not be used to enhance his sentence as it was obtained as part of Arias's cooperation with the Government. Finally, the Defendant cites no authority for his position and the Court should reject this argument.

## IV. The Government's Sentencing Recommendation

The Government recommends that the Court impose a sentence of 300 months, five years of supervised release, and a $600 special assessment. Such a sentence is a lengthy and serious sentence, but one that is appropriate and no longer than necessary to address the seriousness of the offense, provide sufficient deterrence, and protect the public, while also considering the specific characteristics of the Defendant and the case at hand.

### A. A sentence of 300 months is appropriate under the circumstances of the case, characteristics of the Defendant, and the 3553(a) factors.

The Court must first correctly calculate the applicable Guidelines range, and then consider the § 3553(a) factors in determining the appropriate sentence. Section 3553(a) requires district courts to consider the following factors in

7

imposing a sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect (A) the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to provide general deterrence; (C) to provide specific deterrence; and (D) to provide the defendant with appropriate rehabilitation options; (3) the kinds of sentences available; (4) the advisory Guidelines range; (5) the Guidelines' policy statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution. 18 U.S.C. § 3553(a)(1)–(7). "The weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court." *United States v. Clay*, 483 F.3d 739, 743 (11th Cir. 2007) (quotation marks omitted).

   a. **The Nature and Circumstances of the Offense**

The Defendant and his conspirators engaged in a multi-year, multi-country, and multi-million dollar cocaine conspiracy. The conspiracy involved dozens of participants, both knowing and unknowing. The Defendant coordinated the travel of dozens of couriers who smuggled cocaine back from Costa Rica to the United States. The Defendant then personally moved a large percentage of that cocaine to Rhode Island, where it was sold. As part of the scheme, the Defendant received over $400,000 in cash deposited into his bank account as compensation for his criminal conduct. Tr. Exh. 317.

Greed represents the driving factor in the Defendant's crimes. This was born out in Arias's testimony regarding the Defendant's demands for increased

8

payments, it was shown in the Defendant's text messages at trial, and it was shown in the Defendant's post-indictment statements to Arias. Tr. Exh. 62.

### b. The History and Characteristics of the Defendant

The PSR identifies some history and characteristics of the Defendant that are mitigating. These include a difficult childhood, a difficult family situation and difficulties in school. (PSR ¶¶ 113-121). And while the Defendant has had numerous arrests, this is his first criminal conviction. However, there are characteristics of the Defendant that also weigh in favor of the sentence requested by the Government.

#### i. The Defendant's Lies to the Probation Officer

Shortly before his trial, the Defendant submitted a motion *in limine* seeking to exclude "evidence of fraudulent activity Mr. Blair was allegedly involved in including but not limited to credit repair fraud and real estate fraud." (Defendant's Motion *in Limine* to Exclude Evidence of Irrelevant Photographs and Video at Trial, page 5 (Apr. 20, 2023)). During his PSR interview, the Defendant stated that he was self-employed as the owner of MBRH Incorporated from 2009 to 2017. (PSR ¶129). MBRH allegedly specialized in credit repair and counseling. *Id*. The Defendant stated he earned $22,000 per month through MBRH. *Id*. However, neither the Georgia nor North Carolina Secretary of State contain any record of MBRH Incorporated.

The Guidelines impose an increase of two offense levels if

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the

9

obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense [].

U.S.S.G. § 3C1.1.

"[P]roviding materially false information to a probation officer in respect to a presentence . . . investigation" warrants the §3C1.1 enhancement. U.S.S.G. § 3C1.1 comment. note 4(H). Information is "materially false" if it "would tend to influence or affect the issue under determination." *Id.*, note 6. Even if the misleading information does not amount to a material falsehood, and thus does not trigger a §3C1.1 enhancement, the statement "may warrant a greater sentence within the otherwise applicable guideline or affect the determination of whether other guideline adjustments apply (*e.g.*, § 3E1.1 (Acceptance of Responsibility))." *Id.*, note 5.[3]

### a. *Determining Materiality under §3C1.1*

"[T]he threshold for materiality [under § 3C1.1] is conspicuously low." *United States v. Dedeke*, 961 F.2d 164, 167 (11th Cir. 1992). A defendant's omission or misrepresentation is material if the information is relevant to any part of the sentencing process. *Id.* In *Dedeke*, the defendant failed to disclose a prior misdemeanor conviction to his probation officer during his presentence

---

[3] While the Government objected to the PSR provisions concerning the Defendant's prior employment, the Government did not ask for a two-level Guidelines enhancement under § 3C1.1. However, the Government believes that the Defendant's lies bear upon an appropriate sentence under 18 U.S.C. § 3553(a) and that the analysis for materiality under U.S.S.G. § 3C1.1 is relevant to the weight to give to those lies in determining an appropriate sentence.

investigation. *Id*. at 165. As an uncounseled conviction and misdemeanor, that conviction had no bearing upon the defendant's criminal history calculation; it "could only operate to influence the sentencing court's choice of sentence within the unaffected guideline range." *Dedeker*, 961 F.2d at 166. However, the "issue under determination" when the officer inquired about prior convictions was either (a) the defendant's criminal history category *or* (b) determining the appropriate sentence within the calculated range. *Id*. at 167. Because the misdemeanor conviction would have affected determination of the appropriate sentence, the defendant's failure to disclose it was material. *Id*. *See also United States v. Odedina*, 980 F.2d 705, 707 (11th Cir. 1993) (aliases and prior misdemeanor were material because the information could have impacted the sentence imposed within the guideline range); *United States v. Simpson*, 283 Fed. Appx. 747, 752 (11th Cir. 2008) (ownership of real estate assets was material because of potential impact upon bond amount).

The Government recognizes that the Defendant's maximum sentencing calculation and Guidelines range is 324-405 months. While the Government does not seek the maximum sentence, and is actually asking the Court for a sentence *below* the Guidelines, the Defendant's lies to the probation officer regarding his employment history—made after successfully arguing that this information should not be admitted at trial—are arguably material for two reasons. First, they indicate his failure to appreciate the implications of his previous fraudulent conduct. Even after being convicted at trial, the Defendant continues to not

accept responsibility and to act in a manner that suggests that he will have difficultly being rehabilitated.

Second, the Defendant's lies evince a lack of candor to the Court. If his assertions were true—if the Defendant actually had a history of operating a successful business in accordance with the law—such information would arguably indicate a greater chance of true rehabilitation and weigh in favor of a lesser sentence. But the Defendant's efforts to preclude evidence of such a business at trial and the lack of Secretary of State records belie his credibility on this issue. The Government thus asks the Court to consider this pattern of behavior as support for imposing a significant sentence.

### ii. The Defendant's Conduct While Pending Trial

During trial, the Court heard testimony from co-defendant Jason Arias. As part of that testimony, the Government admitted Trial Exhibit 62. This was a video of the Defendant yelling at Arias about giving him his "damn money." This video demonstrates the core reason that the Defendant participated in the conspiracy: greed.

### iii. The Need to Avoid Unwarranted Sentence Disparities

A number of defendants were convicted in relation to this conspiracy. Their roles in the conspiracy are wide ranging. Summer Schwartz and Sequoia Quixote were couriers recruited by the Defendant. Quixote, who is *far* less culpable than the Defendant, received a 120 month sentence. Madison Kelleher, who was

recruited by David Barros, received a sentence of three years probation from this Court. Like Quixote, Kelleher is far less culpable than the Defendant.

The Court also sentenced David Barros, the codefendant who also went to trial. Barros received a sentence of 168 months. The Government's requested sentence is substantially higher than the sentence that Barros received; however, the Government views the two men as having extremely different roles in the conspiracy.

First, Defendant's conduct far exceeds that of any other codefendant who has been sentenced. The Defendant is responsible for over 190 kilograms of cocaine in the PSR, an amount many multiples higher than Barros was held accountable for in his PSR. (PSR ¶ 79). The Defendant made decisions as part of the conspiracy. He recruited travelers, set up travel, booked hotels, coordinated the movement of drugs, and moved money to Costa Rica to fund the conspiracy. He also received hundreds of thousands of dollars in cash to compensate him for his crimes. Tr. Exh. 317.

The cash deposits reflected in the accounts of Barros and the Defendant are instructive. The Defendant received over seven times as much money, over a shorter time period, than Barros did. *Compare* Tr. Exh. 316; Tr. Exh. 317. This vastly higher amount of money demonstrates the Defendant's greater role in the conspiracy, his decision-making authority, and his greater culpability. While the requested sentence for the Defendant exceeds that of Barros, it is not disparate because it is based on the Defendant's vastly greater role in the offense, drug quantity, and money laundering level.

## CONCLUSION

For the foregoing reasons, the United States requests that the Court sentence the Defendant to a sentence of 300 months, a $600 special assessment, and 5 years of supervised release.

Respectfully submitted,

RYAN K. BUCHANAN
UNITED STATES ATTORNEY

/s/Tyler A. Mann
TYLER MANN
ASSISTANT UNITED STATES ATTORNEY
Ga. Bar No. 320397

/s/Calvin A. Leipold, III
CALVIN A. LEIPOLD, III
ASSISTANT UNITED STATES ATTORNEY
Ga. Bar No. 442379

**Certificate of Service**

The United States Attorney's Office served this document today via ECF to:

Caitlyn Wade, Attorney for Defendant Blair

September 21, 2023

                                          /s/ Calvin A. Leipold, III
                                          Calvin A. Leipold, III
                                          *Assistant United States Attorney*